**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Rodger D. Ferguson, | ) | |
| | ) | **ORDER GRANTING DEFENDANT'S** |
| Plaintiff, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **AND DENYING PLAINTIFF'S MOTION** |
| vs. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| Carolyn W. Colvin, Acting Social Security | ) | |
| Administration Commissioner, | ) | Case No. 4:15-cv-032 |
| | ) | |
| Defendant. | ) | |

Plaintiff, Rodger Ferguson ("Ferguson"), seeks judicial review of the Social Security Commissioner's denial of his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et. seq* . This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.      BACKGROUND

### A.      Procedural history

Ferguson first applied for DIB and SSI while living in Kentucky on March 7, 2008.  (Tr. 142).  An Administrative Law Judge ("ALJ") determined Ferguson was not disabled on January 21, 2010.  (Tr. 151).  No appeal was taken.

Ferguson filed his second application for DIB and SSI while he was living in North Dakota on May 6, 2010, amending his allege onset date to January 22, 2010.  (Tr. 298-302, 292-296).  His application was denied initially and upon reconsideration.  (Tr. 157-159, 188-189).

An ALJ convened an administrative review hearing on November 23, 2011. (Tr. 41).  She issued a written decision denying Ferguson's application on January 13, 2012.  (Tr. 173).  The

Appeals Council granted Ferguson's subsequent request for review on December 18, 2012, and remanded the case to an ALJ for an additional hearing to determine whether Ferguson had severe cardiovascular impairment and, if so, to determine the effect that impairment had on Ferguson's occupational base. (Tr. 179-181). The additional hearing was held on April 23, 2013. (Tr. 92). On July 17, 2013, the ALJ issued an unfavorable decision. (Tr.33). Ferguson requested review of the ALJ's decision with the Appeals Council. (Tr. 15). The Appeals Counsel denied Ferguson's request for review thereby rendering the ALJ's decision as the Commissioner's final decision on February, 19, 2015. (Tr.1-5).

Ferguson initiated the above-entitled action on March 30, 2015, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). See Docket No. 1. Ferguson filed a motion for summary judgment on September 2, 2015. See Docket No. 10. The Commissioner filed a response in opposition to Ferguson's motion and his own motion for summary judgment on October 5, 2015. See Docket No. 13. Ferguson filed a reply brief on November 2, 2015. See Docket No. 16. The parties have also filed notice of their consent to the undersigned's exercise of jurisdiction over this matter. See Docket Nos. 4 & 5.

    **B.**    **Personal background**

Ferguson was born in 1951 and was 62 years old on the date of the second administrative hearing. (Tr. 97). He is 5'7" and weighs approximately 185 pounds. (Tr. 47). He is divorced and has eight children. (Tr. 47). He lives in an basement apartment in Minot, North Dakota, with his daughter and her husband (Tr. 98). He has an eighth grade education and testified that he was able to read, write, and do simple math. (Tr. 49, 133). Ferguson's past relevant work includes that of a cashier, equipment operator, quality assurance inspector, factory laborer, street sweeper, machine

operator, cook, and cab driver/dispatcher. (Tr. 49-59; 103). Although Ferguson briefly worked as a cab driver at Johnson's Cab Company in Elizabethtown, Kentucky since the alleged onset date, he has not engaged in anything that qualifies as substantial gainful activity. (Tr. 23; 99-100).

**C.** **Medical evidence**

**1.** **Medical records created between January 1, 2010 to December 31, 2010**

Ferguson presented to James Jackson, M.D. on January 5, 2010, as a new patient and indicated that his medical problems included high blood pressure, osteoarthritis, a "leaky" heart valve, chronic obstructive pulmonary disorder ("COPD"), gastritis, and gastroesophageal reflux disease ("GERD"). (Tr. 469-470). Dr. Jackson reported Ferguson was in no acute distress, showed good range of motion in his neck, and had clear lungs. (Tr. 470). Less than a month later, Ferguson returned to Dr. Jackson for a routine follow-up exam. (Tr. 472). Dr. Jackson observed Ferguson was in no acute distress, exhibited an appropriate mood, and had clear lungs, but needed to quit smoking. (Tr. 473). On March 24, 2010, Ferguson presented to Dr. Jackson with complaints of left ear hearing loss for the past several months and nausea. (Tr. 474). Dr. Jackson noted Ferguson's breathing and COPD were stable and Ferguson's nausea was likely due to the Chantix he had started to help him quit smoking. (Tr. 474-475). Dr. Jackson advised Ferguson to discontinue the Chantix. (Tr. 475).

Ferguson sought treatment in July and August 2010 for GERD, arthritis, and hypertension. (Tr. 482, 491). During Ferguson's July 2010 examination, his health care provider prescribed Celebrex and over-the-counter Tylenol for Ferguson's osteoarthritis, and recommended he stop smoking. (Tr. 482). During the August 2010 examination his health care provider noted Ferguson's examination was normal and lungs were clear. (Tr. 492).

On August 20, 2010, Ferguson underwent a consultive examination with Dr. Mojgan Mohandesi and Dr. Wade Talley (Tr. 493-495). Ferguson reported having chronic neck and back problems since 1991, emphysema, skin cancer, hypertension, COPD, GERD, spondylosis, osteoarthritic changes of his hip, and a "leaky" heart valve. (Tr. 493). Upon examination Dr. Talley observed Ferguson made eye contact, answered questions appropriately, and was in no acute distress. (Tr. 494). He also noted Ferguson showed tenderness to palpation to his posterior neck and a decreased range of motion due to pain, but had good coordination and strength in his upper extremities. (Tr. 494). Dr. Talley reported that Ferguson had full function and movement of his elbows, wrists, and fingers, was able to pick up a pencil, penny, and other small objects without difficulty, and showed present and equivocal sensory functioning in his upper and lower extremities. (Tr. 494-495). Dr. Talley further indicated Ferguson had a good gait, full muscle strength in all his major muscle groups, and no muscle atrophy. (Tr. 494). Cervical and lumbar spine x-rays showed the beginning of degenerative joint disease of Ferguson's lower cervical spine and facet joint osteoarthropathy in his lumber spine. (Tr. 495, 497). Psychiatric exam was appropriate without depression or anxiety. (Tr. 495).

On October 21, 2010, Dr. Charles Gasser assessed Ferguson's hearing and found he had a sensorineural hearing loss affecting his right ear and a moderate conductive mixed hearing loss affecting his left ear, and that he was a candidate for amplification should he wish to pursue it. (Tr. 499).

Dr. Marlin Johnson, the state agency reviewing physician, reviewed the evidence in Ferguson's case on October 28, 2010, and concluded Ferguson retained the ability to perform light work. (Tr. 504-507). Dr. Thomas Christianson confirmed Dr. Johnson's assessment on January 25,

2011.  (Tr. 512).

## 2. Medical records created after December 31, 2010

On April 10, 2012, Dr. Abdi Agahtehrani placed stents in Ferguson's right coronary artery and for the three days following the placement restricted Ferguson from strenuous activity, lifting more than 10 pounds, swimming, tub baths, climbing several flights of stairs, and sitting for more than two hours.  (Tr. 446).

On September 13, 2012, Ferguson underwent coronary bypass surgery due to coronary artery disease and angina.  (Tr. 523).  Following bypass surgery, Ferguson returned to Dr. Agahtehrani three times for follow-up visits between October 2012 and May 2013.  (Tr. 538, 540, 542). Ferguson reported chest pain during each visit, but Dr. Agahtehrani recommended only that Ferguson continue taking prescribed medications (Id.).  Ferguson reported during all three visits that he continued to smoke.  (Id.).

On August 12, 2013, Ferguson presented to the emergency room complaining of a productive cough and headaches, but denying chest pain and shortness of breath.  (Tr. 552, 554).  Dr. Theodore Forrest noted upon examination that Ferguson was in no acute distress, showed a normal range of motion in his neck, and had normal pulmonary effort.  (Tr. 554).  Dr. Forrest also reported Ferguson exhibited normal strength, coordination, and muscle tone, and showed no cranial nerve deficits or tenderness.  (Id.).  Additionally, a chest x-ray revealed no acute disease and a computed tomography ("CT") study of Ferguson's head showed no acute intracranial findings.  (Tr. 526-527).

## D. November 23, 2011 Administrative Hearing

The ALJ convened Ferguson's first hearing on November 23, 2011.  (Tr. 41).  Ferguson appeared personally and was accompanied by his attorney.  A vocational expert also appeared by

phone.  (Tr. 41).  Ferguson's attorney requested an amended onset date of January 22, 2010, which is the day after his application in Kentucky was denied.  (Tr. 45).  The ALJ agreed to this, and questions proceeded.  (Tr. 46).

### 1.  Ferguson's testimony

Ferguson testified he was 60 years old and lived in a trailer in Minot, North Dakota with his daughter and son-in-law.  (Tr. 48).  As to his education he stated he had completed the eighth grade.  (Tr. 49).  He testified he has no problems reading, writing, or doing simple math.  (Tr. 49).  He is 5'7" and weighs 185 pounds. (Tr. 47).  He is right-handed.  (Tr. 47).  He had his drivers license and drove a couple of times a week to the store. (Tr. 48-49).  He last worked as a night shift dispatcher at a cab company in February 2008, working approximately 60 hours a week.  (Tr. 49-51).

When asked what prevents him from working, Ferguson testified that he is unable to concentrate, and has frequent headaches, "popping bones", nausea, light-headedness, and dizziness.  (Tr. 59-60).  He also testified that he has problems with his hearing, especially when he is laying down.  (Tr. 60).  When asked whether he ever got a hearing aid, he answered no because he did not have the money.  (Tr. 60.).

Ferguson stated that he traveled to Kentucky at the end of February 2011 because his daughter was experiencing problems with her pregnancy.  (Tr. 62).  His ex-wife became sick around that same time so he traveled back and forth from North Dakota to Kentucky to help her out.  (Tr. 62-63).  He helped his ex-wife by doing some light cooking, grocery shopping, and helping her shower.  (Tr. 65). He also testified that it takes him a long time to get to the store and he usually forgets to buy something even though it was on the list.  (Tr. 65).  He further testified that while staying with his ex-wife, he used a bathing/shower chair due to his unstableness.  (Tr. 64-65).

When asked by the ALJ if he was taking any medications regularly, Ferguson responded that he took aspirin and Tylenol and was supposed to be taking his blood pressure pills, but was out of them. (Tr. 66-67). When asked why he did not get medical help in Kentucky at free clinics, Ferguson responded that he did not feel it was proper to use the free clinics in Kentucky because he lived in North Dakota. (Tr. 64-65).

Ferguson testified that he used a "traction kit" on his neck which helped relieve the pressure and he also used a "TENS unit" which is an "electronic gizmo" that flexes the muscles in the back. (Tr. 68). When asked whether he relied on any assistive devices, he responded that he has a cane but it is in storage and he cannot get to it. (Tr. 68). When asked about his nausea, Ferguson responded that it comes and goes and that it feels better after he lays down for a couple of hours. (Tr. 68-69). He stated that he usually has to lay down twice a day due to the nausea. (Tr. 69). Ferguson also testified that he gets light-headed usually every day, he has trouble concentrating on anything, and he smokes approximately one and a half packs of cigarettes a day. (Tr. 69-71).

Ferguson reported that he has pain in his neck which causes frequent headaches. (Tr. 71-72). He also reported problems with his back, right knee, and ankles. (Tr. 72). He can sit for about 30 to 40 minutes until his back gets stiff. (Tr. 73). He can stand for about 20 minutes until he has to sit down because his head starts hurting and he becomes unstable. (Tr. 73). He can walk for about 100 feet until he gets out of breath and can lift about five or 10 pounds before it starts hurting his back. (Tr. 73).

## 2. Vocational expert's testimony

When examining the vocational expert, the ALJ first inquired whether a hypothetical individual with Ferguson's vocational profile could perform Ferguson's past relevant work if he:

(a) could lift 25 pounds frequently and 50 pounds occasionally; (b) sit with normal breaks for a total of about six hours in an eight-hour workday; (c) would have hearing loss, but would retain the ability to hear and understand oral instructions, and communicate information; (d) could not work with a telephone; (e) would have no postural limits, visual limits, or environmental limits. (Tr. 86-87). Second, she inquired whether an individual with Ferguson's vocational profile and aforementioned mental restrictions could perform Ferguson's past relevant work if he: (a) could lift and/or carry 20 pounds occasionally and 10 pounds frequently; (b) could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; (c) could sit with normal breaks for a total of about six hours in an eight-hour workday; (d) would have hearing loss, but would retain the ability to hear and understand oral instructions, and communicate information; (e) could not work with a telephone; would have no postural limits, visual limits, or environmental limits. (Tr. 88). Third, she inquired whether an individual with Ferguson's vocational profile and aforementioned mental restrictions along with the limitations described in the second hypothetical along with the added limitation that the individual would need to lie down twice a day for several hours a day could perform Ferguson's past relevant work. (Tr. 88-89).

The vocational expert responded that the individual described in the first hypothetical could perform Ferguson's past work as a cook, inspector, doing the bolt work, doing the forklift work, cashier checker, street sweeper, operator, assembler, survey worker, and machine operator. (Tr. 88). As for the individual described in the second hypothetical, the vocational expert testified that he would not be able to perform Ferguson's past relevant work as he actually performed those jobs but could generally perform work as a cashier checker, street sweeper operator, assembler, and production. (Id.). Finally, with respect to the third hypothetical, the vocational expert testified that

the parameters outlined by the ALJ would exclude the individual from essentially all jobs. (Tr. 89).

After the vocational expert had responded to the ALJ's hypotheticals, Ferguson's counsel was afforded an opportunity for examination. First, counsel inquired whether an individual would be able allowed in competitive employment to work at their own pace, which was a slow and much less than an average pace. (Tr. 89). Second, counsel inquired whether or not it would be tolerated by an employer if the individual was not able to keep to an employer's strict schedule. (Tr. 89). Third, counsel inquired whether an individual who only had the focus and concentration to maintain 30 minutes of activity at one time would be allowed such opportunity in competitive employment. (Id.). Finally, counsel inquired whether an individual who had to take frequent breaks outside the normal break periods, would be allowed such opportunity in competitive employment. (Id.). The vocational expert responded that none of the situations described by counsel would be tolerated in competitive employment. (Tr. 88-89).

### E.    ALJ's January 13, 2012 decision and appeal

The ALJ issued a decision on January 13, 2012, in which the ALJ concluded that Ferguson was not disabled. (Tr. 166-173). Ferguson asked the Appeals Council to review the decision. The Appeals Council granted Ferguson's request for review. (Tr. 180). On December 18, 2012, the Appeals Council issued a remand order stating in relevant part:

> The claimant has submitted new evidence which indicates he may have had a severe cardiovascular impairment during the period at issue. An operative note from Norton Audubon Hospital dated September 13, 2012, indicates the claimant underwent a three vessel coronary bypass surgery on that date after having undergone an angioplasty of the right coronary artery in April 2012. At the hearing the claimant complained of dizziness and shortness of breath with exertion, and at the consultive examination he complained of chest pain associated with walking (Exhibit C6F, page 2).

(Tr. 180). The Appeals Council directed the ALJ to giver further consideration to whether the

claimant had a severe cardiovascular impairment during the period at issue. (Tr. 180).

## F.     April 23, 2013 Administrative Hearing

The ALJ convened Ferguson's second hearing on remand on April 23, 2013. (Tr. 92). Ferguson appeared personally and was accompanied by his attorney. A vocational expert, Warren Haganson also appeared by telephone. (Tr. 92). The ALJ informed everyone that he was not going to limit what was presented at the hearing, but he did want to specifically hear information about whether there was any additional limitations caused by any cardiovascular impairment. (Tr. 96). The ALJ also pointed out that Ferguson needed to show that he became disabled sometime prior to December 31, 2010, the date he was last insured. (Tr. 96).

### 1.     Ferguson's testimony

Ferguson testified he was 62 years of age and lived with his daughter and son-in-law in a basement apartment in Minot, North Dakota. (Tr. 97-98). He began working for Johnson's Cab Company the end of March 2012. (Tr. 99). He worked approximately three days before he experience chest pains and was admitted to the hospital and received two stents in his right coronary artery. (Tr. 99). He briefly went back to work after he had his heart surgery in September 2012 at Johnson's Cab Company in Elizabethtown but had to stop working because it was "too much". (Tr. 98-99). Ferguson testified that the most he made at Johnson's Cab Company was around $700 per month. (Tr. 100). Prior to his attempt at working at Johnson's Cab Company again in 2012, he last worked in 2008 for the same company. (Tr. 100-101). Ferguson testified that he traveled to Kentucky at the end of February 2011 because his daughter was experiencing problems with her pregnancy. (Tr.102). His ex-wife became sick around that same time so he traveled back and forth from North Dakota to Kentucky to help her out. (Tr. 102).

When asked whether he thinks he would be able to do any of his jobs today with his health problems, Ferguson answered no because he does not have the energy. (Tr. 102-03). He further explained that he would not be able to work because of his spine surgery, numbness in his arms and hands, his leg burns and aches where they removed the main artery, he wakes up frequently during the night, he is weak and tired, he gets nauseated, and he has to lay down often. (Tr. 104). Ferguson agreed with the ALJ that besides his open heart surgery in 2012 he had these health problems prior to the end of 2010. (Tr. 104).

Ferguson testified that his main health problem is his heart. (Tr. 105). He was told by a doctor that he had a medically-determinable heart problem in 2008. (Tr. 106-07). When asked whether he had any medical treatment between 2008 and 2012 for any heart condition, Ferguson responded that they were keeping his blood pressure regulated and taking medication. (Tr. 107). Ferguson testified that he received medical treatment for his heart from Dr. Johnson at the Portland Medical Clinic in Louisville, Kentucky. (Tr. 107). When asked what changed in 2012 that caused him to go to the doctor for chest pain, Ferguson answered that he attempted to go back to work the end of March but he assumed that the stress from trying to work caused his chest to start hurting and aching. (Tr. 107-08). After he had the stents placed in his right coronary artery, he went back to the doctor and had an EKG and x-ray completed. (Tr. 109). Ferguson had triple bypass surgery in September 2012. (Tr. 110). When asked whether he had any follow up treatment since the open heart surgery, Ferguson responded that he has gone back to the doctor and they have him on medication to keep his heart regulated. (Tr. 110). Ferguson testified that he still has chest pains and he carries nitroglycerin with him in case it becomes serious and the pain does not go away. (Tr. 110). Ferguson also takes blood pressure medication. (Tr. 110).

When asked whether doctors put any restrictions on his activities because of his heart condition, Ferguson responded in the negative. (Tr. 111). Ferguson testified that he is not being treated for any other health condition. (Tr. 112). Ferguson testified that he does use a cane now to help him balance but admitted that a doctor did not prescribe it for him. (Tr. 118-19).

Ferguson testified that prior to the end of 2010 he could only walk about a block before needing a break, could stand for approximately 20 to 30 minutes before needing to sit down, could carry about 10 pounds before hurting, and could only sit for a limited period before he gets stiff and sore. (Tr. 125-26).

### 2.      Vocational expert's testimony

When examining vocational expert, the ALJ first inquired whether a hypothetical individual who is over the age 60 but not yet 65, with an eighth-grade formal education, with Ferguson's vocational profile and medically determinable impairments that cause the same work-related limitations described by Ferguson could perform Ferguson's past relevant work. (Tr. 134). The vocational expert responded in the negative indicating that Ferguson's reported limited standing ability and need for frequent rest breaks would not be tolerated in the employment described in Ferguson's work history report. (Tr.134-135).

The ALJ next inquired whether an individual with Ferguson's vocational profile and aforementioned mental restrictions could perform Ferguson's past relevant work if he: (a) could lift and carry 20 pounds occasionally and 10 pounds frequently; (b) could stand, walk, or sit for a total of about six hours in an eight-hour workday; (c) had unlimited push-pull ability; (d) had no limitations in postural activities, manipulative, or visual activities; and (e) had limitations in hearing. (Tr. 135). The vocational expert responded that the individual described in this hypothetical could

perform Ferguson's past work as a cashier checker, inspector, and street sweeper operator as performed in the national economy. (Tr. 135-36). The ALJ then inquired whether a person would be able to perform any of those jobs if they had the limitations described by Ferguson. (Tr. 136). The vocational expert responded that a person with the limitations described by Ferguson would not be able to perform any of his past jobs nor any other employment. (Tr. 136).

After the vocational expert had responded to the ALJ's questions, counsel for Ferguson was afforded an opportunity for examination. Counsel inquired whether an individual who was not able to maintain the focus or concentration for two hour periods of time without needing to rest would be precluded from working any of the past jobs. (Tr. 136). The vocational expert responded in the affirmative stating that if a person is unable to concentrate for two hours, all competitive employment would be ruled out (Tr. 136).

### G.    ALJ's July 17, 2013 decision

The ALJ issued his written opinion denying Ferguson's application for DIB and SSI on July 17, 2013. (Tr. 21-24). The ALJ first found that Ferguson met the insured status requirements of the Social Security Act through December 31, 2010. (Tr. 21). Next, the ALJ employed the five-step sequential analysis when evaluating Ferguson's application. At step one, he observed that Ferguson had not engaged in any substantial gainful activities since January 22, 2010, his alleged onset date. (Tr. 23). At step two, the ALJ recognized that Ferguson suffered from the following severe impairments: degenerative disc disease, chronic obstructive pulmonary disease, and bilateral hearing loss. (Tr. 23). The ALJ also found that Ferguson's heart problems, headaches, and right hip pains were not severe impairments.[1] (Tr. 24-26).

----

[1] As stated previously, the Appeals Council directed the ALJ to give further consideration to whether Ferguson had a severe cardiovascular impairment during the period at issue because Ferguson had submitted new evidence which

Moving on to step three, the ALJ compared Ferguson's impairments to the presumptively disabling impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 26-27). In so doing, the ALJ concluded that none of Ferguson's aforementioned impairments, either individually or in combination, were presumptively disabling. (Tr. 26-27).

The ALJ next assessed Ferguson's residual functional capacity, *i.e.*, his "ability to do physical or mental work activities on a sustained basis despite limitations from his impairments." (Tr. 27-32). The ALJ made the following determination with respect to Ferguson's residual function capacity:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) within the following parameters: the claimant can occasionally lift up to 20 pounds; frequently lift up to 10 pounds; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday. The claimant has no postural, manipulative, visual or environmental limitations. Although the claimant does have limited hearing, he retains the ability to understand and respond to oral communications.

(Tr. 27). In so doing the ALJ acknowledged that Ferguson's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 28). He nevertheless concluded that the record and objective medical evidence did not support the level of impairment claimed by Ferguson during the relevant time period for a number of reasons in more detail infra. (Tr. 28-32). The ALJ found Ferguson's subject complaints were less than credible and not supported by objective observation or assessment. (Tr. 28).

---

indicated he may have had a severe cardiovascular impairment during the time frame at issue. The ALJ analyzed this issue thoroughly and concluded that the medical records did not establish a formal diagnosis of a cardiovascular condition arising from medically acceptable clinic and laboratory diagnostic techniques prior to April 2012. (Tr. 25).

Even though Ferguson testified that his main health problem was his heart, Ferguson did not dispute the ALJ's finding about his heart issues in his current motion for summary judgment. The court would note however, that although there may be enough evidence that Ferguson had a cardiovascular condition or coronary artery disease as of April 2012, there is sufficient evidence to support the ALJ's finding that he did not have a cardiovascular condition or coronary artery disease on December 31, 2010, his date last insured.

At the fourth step the ALJ determined that Ferguson was capable of performing past relevant work as an inspector of nonferrous metals. (Tr. 33). Ferguson had worked as an aluminum inspector from 1999 to 2004. (Tr. 33). The ALJ noted the vocational expert's testimony that an individual with Ferguson's RFC would be able to perform such work both as described by Ferguson and as described in the Dictionary of Occupational Titles. (Tr. 33). As a consequence, the ALJ ruled that Ferguson was not disabled as defined by Social Security Act and was ineligible for either DIB or SSI benefits. (Tr. 33).

Having determined Ferguson could perform his past relevant work as an aluminum inspector, the analysis ended without reaching the fifth step which would have required determining whether Ferguson could perform other work considering his RFC, age, education, and work experience.

## II.  GOVERNING LAW

### A.  Standard of review

The scope of this court's review is limited. The court it is not permitted to conduct a *de novo* review. Rather, it must look at the record as a whole to determine whether there is substantial evidence to support the Commissioner's decision. Ellis, 392 F.3d at 993.

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. E.g., Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) ("Buckner"). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny

benefits without being subject to reversal on appeal." Id.  Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion.  Id.; Buckner, 646 F.3d at 556  ("Rather, if, after reviewing the record, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner.") (internal quotations and citations omitted).

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) ("Haggard"); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993) ("Brockman").  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide."  Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) ("Anderson").

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner.  The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner.  Ellis, 392 F.3d at 993.

**B.**    **Law governing eligibility for adult benefits**

An individual shall be considered to be disabled for purposes of DIB if the person is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. E.g., Hilkenmeyer v. Barnhart, 380 F.3d

441, 443 (8th Cir. 2004); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be entitled to disability benefits, a claimant must prove he was disabled before his insurance expired. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[2] and determine:

(1) whether the claimant is presently engaged in a substantial gainful activity,

(2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4) whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

III. **ANALYSIS AND DISCUSSION**

Ferguson makes five arguments in support of his motion for summary judgment: (1) the

---

[2] The provisions in 20 CFR Part 404 apply to DIB and the provisions in Part 416 apply to SSI benefits.

Appeals Council failed to review additional evidence submitted by Ferguson; (2) the ALJ erred by not finding Ferguson's impairments equaled Listings 1.02, 11.03, and 3.02; (3) the ALJ improperly rejected the opinions of his treating physicians without contacting them and requesting additional information; (4) the ALJ improperly rejected Ferguson's testimony as not being credible; and (5) the ALJ failed to accurately and thoroughly present hypotheticals to the vocational expert.

### A.    Additional evidence

Ferguson argues the Appeals Council erred by not considering the additional supporting evidence he submitted before denying review. In support of his request for review by the Appeals Council, Ferguson submitted additional medical records from: (1) Norton Healthcare from April 8, 2012 to November 27, 2013; (2) Norton Audubon Hospital from August 12, 2013; and (3) Norton Audubon Hospital from June 2, 2008 to August 12, 2013. (Tr. 526-545; 546-586; 587-590).

However, the Appeals Council did consider the additional evidence before declining review. The Appeals Council stated in their decision:

> In looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals Council. We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of evidence of record. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. 1-2). Since the Appeals Council considered the additional evidence, this court does not evaluate the Appeals Council decision to deny review under controlling Eighth Circuit precedent. Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994). Instead, the court must determine "whether the administrative law judge's determinations is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." Id., citing Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992).

Consequently, the court concludes that the Appeals Council properly considered the record including the additional evidence submitted by Ferguson when reaching their decision to deny review.

**B.**     **Listing-level impairments**

Ferguson argues he meets Listings 1.02 for major dysfunction of a joint, 11.03 for Epilepsy, and 3.02(B) for chronic restrictive ventilatory disease.  The Commissioner contends that the ALJ properly determined that Ferguson was not disabled at step three of the sequential evaluation process because Ferguson did not meet his burden to show he meets all of the criteria in the listing for which he claims disability.

A listing-level impairment is one that is presumptively disabling without consideration of the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d).  The burden is on the claimant to show he has a listing-level impairment.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  In order to meet this burden, the claimant must show he meets all the specified medical criteria.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  An impairment that meets only some of the criteria, no matter how severe, is insufficient.  Id.

**1.**     **Listing 1.02 impairment**

Ferguson argues that he meets Listing 1.02, "Major Dysfunction of a Joint."  See Docket No. 11 at 3-4.  Ferguson references weakness, pain, numbness in his arms and hands, inability to perform fine motor manipulative movements on more than an occasional basis, and inability to walk more than a block before needing to rest following his 2002 cervical fusion.

Listing 1.02 provides as follows:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,

instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.   Effective ambulation is defined to mean:

b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

See 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b.

Although Ferguson used a cane at the time of the administrative hearing on April 23, 2013 and testified that he used the cane to help him balance (Tr. 119), he is still able to ambulate

effectively as defined in § 1.00B2b. Among other things, he has a driver's license and is able to drive a car. He drives to the store to buy groceries for himself and his ex-wife. He does not use a walker, two canes, or two crutches. Ferguson testified he goes frequently goes back and forth between North Dakota to Kentucky. However, there is no evidence he needs companion assistance when traveling. Finally, Ferguson can complete all his daily living activities, including house cleaning, cooking, laundry, bathing, and dressing, although it takes him longer to do.

In summary, the court concludes there is substantial evidence supporting the ALJ's conclusion that Ferguson's impairments do not meet or equal Listing 1.02.

### 2.      Listings 11.03 and 3.02 impairments

Ferguson argues that he meets Listing 11.03 "Seizure" because his "migraines occur more frequently than once per week and are disabling in nature." See Docket No. 11 at 4. Ferguson also argues "may meet or equal" Listing 3.02(B) "Chronic Pulmonary Insufficiency" due to his COPD exacerbations. See id.

The burden is on the claimant to show he has a listing-level impairment. Johnson, 390 F.3d at 1070 (8th Cir. 2004). The court rejects Ferguson's conclusory assertions that the ALJ failed to consider whether he met Listings 11.03 or 3.02(B) because Ferguson has failed to provide any relevant law or facts supported by the record regarding these listings. See Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) (summarily rejecting appellant's conclusory assertion that the ALJ failed to consider whether he met certain listings where the appellant provided no analysis of the relevant law or facts); see also Reynolds v. Astrue, 390 Fed. App'x 612, 613 (8th Cir. 2010); Taylor v. Astrue, 467 Fed. App'x 544 (8th Cir. 2012); Walters v. Colvin, 615 Fed.App. 394, 395 (8th Cir. 2015) (all finding the same). Therefore, there is substantial evidence supporting the ALJ's

conclusion that Ferguson's impairments do not meet or equal Listings 11.03 or 3.2(B).

## C. RFC determination

Having reached the fourth step of the five-step sequential analysis, the ALJ was required to assess Ferguson's RFC. As explained previously, RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). "The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Lacroix v. Bernhardt, 465 F.3d 881, 887 (8th Cir. 2006).

The ALJ determined that Ferguson: (1) could occasionally lift up to 20 pounds; frequently lift up to ten pounds; (2) could sit (for normal breaks) for about six hours in an eight hour workday; (3) could stand/walk (with normal breaks) for a total of about six hours in an eight our workday; (4) had no postural, manipulative, visual or environmental limitations; and (5) retained the ability to understand and respond to oral communicated despite have limited hearing. The ALJ then relied upon his RFC determination, together with testimony from the vocational expert, to conclude Ferguson was capable of returning to his past relevant work and therefore was not disabled. (Tr. 27).

The primary medical evidence that the ALJ relied upon for his RFC determination was the assessment of Ferguson's RFC completed by the State agency consultant, Dr. Marlin Johnson, on October 28, 2010. (Tr. 503-510). Although Dr. Johnson did not personally examine Ferguson, his assessment relied in part upon the results of the physical examination of Ferguson conducted on October 20, 2010, by Dr. Mohandesi and Dr. Talley. On January 25, 2011, Dr. Thomas Christianson reviewed all of the evidence in the file and affirmed Dr. Johnson's assessment. (Tr. 511-513).

Ferguson disagrees with the ALJ's RFC determination. Ferguson contends he cannot

perform his past relevant work due to neck and back pain, COPD, migraine headaches, syncope, vertigo, depression, an inability to focus and maintain persistence and pace, the side effects of his medication, and the need to limit his exposure to fumes and irritants. See Docket No. 11 at 4-5. He contends the record supports his argument that he does not have the RFC to perform any substantial gainful activity let alone light or sedentary duties because these impairments would require "frequent absences, unscheduled breaks and the need to nap, which precludes any and all competitive work activities." See id. at 6. Ferguson argues the ALJ erred in determining his RFC because: (1) the ALJ rejected the opinions of his treating physicians without contacting them and requesting additional information; and (2) the ALJ improperly rejected much of Ferguson's testimony as not being credible.

### 1.    Treating physician's opinions

Ferguson argues the ALJ improperly rejected the opinions of his treating physicians. Ferguson contends the ALJ violated his duty to develop the facts fully and fairly by not contacting these treating physicians and requesting additional information and/or clarification.

Ferguson identifies three physician opinions from 1992 and 1993, which he contends indicate his impairments are permanently disabling. Specifically, he asserts that Dr. Raymond Shea's progress notes dated August 4, 1992, October 6, 1992, and July 7, 1993, stated that Ferguson was permanently and totally disabled. See id. at 5. An ALJ may give a physician's opinions less weight if it is vague, conclusory, and inconsistent with the record. Stormo v. Barnhart, 377 F.3d 801, 805-806 (8th Cir. 2004) (citation omitted). The court has reviewed the entire record and is unable to locate the opinions of Dr. Raymond Shea from August 4, 1992, October 6, 1992, and July 7, 1993, cited by Ferguson in his brief in support of summary judgment nor does the ALJ discuss these

opinions in his decision. In any event, these opinions predate Ferguson's alleged onset date by more than 15 years and therefore have little relevancy to Ferguson's current claims especially since the ALJ cited numerous medical opinions and records that contradict Dr. Shea's alleged opinion that Ferguson is totally disabled. Furthermore, opinions on whether a claimant is disabled or unable to work are reserved to the Commissioner. 20 C.F. R. § 404.1527(e)(1).

Ferguson also relies on Dr. Talley's assessment that Ferguson was having numerous ongoing and difficult health issues. Ferguson attended a physical consultive examination with Dr. Mohandesi and Dr. Talley on August 20, 2010, in Minot, North Dakota. In his decision, the ALJ addressed in detail the opinions of Dr. Mohandesi and Dr. Talley and determined:

> It does not appear that Dr. Mohandesi or Dr. Talley opined as to any work-related abilities or limitations of the claimant following this evaluation. (Ex. C6F). However, it is of note that their examination notes do not reveal findings lending considerable support to the claimant's allegations. Aside form reduced neck range of motion and tenderness of the neck, their physical examination was largely unremarkable. Despite the claimant's allegations of severe weakness and numbness, strength and sensation were both intact. Similarly, despite the claimant's allegations of balance problems and an inability to walk, the claimant's gait and other movements were noted to be unremarkable. As such, these examination findings were given particular weight by the undersigned.

(Tr. 31). The ALJ did not violate his duty to develop the facts by failing to request additional information from Dr. Talley because he properly considered and weighed the opinion evidence provided by Dr. Mohandesi and Dr. Talley. The ALJ "does not...have to seek additional clarifying statements from a treating physician unless a crucial point is undeveloped." Stormo, 377 F.3d at 806. Ferguson does not argue, nor does the court find a crucial point that is undeveloped.

Ferguson also argues that the ALJ should have obtained the opinion of a medical expert because he knew that Ferguson had no health insurance and was unable to maintain consistent care and treatment. This argument lacks merit as the ALJ was not required to obtain a medical expert

opinion, especially since the ALJ ordered a consultive examination.

### 2. Credibility determination

Ferguson argues that the ALJ improperly rejected much of his testimony as not being credible and he alleges the ALJ erroneously determined that his ability to do some chores infers that he can work on a full-time basis. He also argues the ALJ did not thoroughly evaluate the intensity and persistence of his symptoms before determining his RFC.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005) ("Ellis"). A claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218. The court should, "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012) (quoting Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)).

The record shows the ALJ considered multiple factors in assessing Ferguson's credibility. First, the ALJ found the severity of Ferguson's impairments were not consistent with the objective medical evidence in the record. In his opinion, the ALJ summarized in detail the medical evidence that he viewed as being inconsistent with Ferguson's claims. This included: (1) Dr. Shields' medical opinions from 2008; (2) Dr. Jackson's progress notes from January and March 2009 ; (3) the results of the physical examinations conducted by Dr. Mohandesi and Dr. Talley in August 2010; and (4)

the functional capacity assessment made by Dr. Johnson, which in part relied upon the results of the physical examinations made by Dr. Mohandesi and Dr. Talley and which stated that Ferguson's claimed limitations were only "partially credible" and "may be overstated." (Tr. 508).

Next, the ALJ cited Ferguson's failure to obtain treatment for symptoms for a significant period of time. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem."). The ALJ noted that subsequent to February 2009, the record appeared to suggest a gap in medical treatment sought or received by Ferguson. Ferguson was seen as a new patient on January 5, 2010, which the ALJ pointed out was during the time period he was applying for disability benefits. Ferguson was then seen on January 29, 2010, March 24, 210, and then not again until August 20, 2010. The ALJ noted that Ferguson presented for refills of his medication in September of 2010 but other than that the records reveal another lengthy gap in any medical treatment sought or received by Ferguson. Ferguson did receive treatment for cardiovascular problems in 2012, albeit that treatment was also very rare.

Ferguson also contends he had no health insurance since 2010 and was unable to maintain consistent care and treatment. However, the ALJ noted that there was little indication that Ferguson exhausted low-cost or other indigent treatment options, nor was there indication that Ferguson was refused treatment due to his inability to pay. See Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (concluding a lack of evidence that a claimant attempted to find any low cost or no cost medical treatment for his alleged pain and disability is inconsistent with a claim of disabling pain.).

Finally, the ALJ discussed Ferguson's work history, finding that his sporadic work history dating to 2005 did not lend significant probative weight to his allegations. The ALJ noted the fact that Ferguson reported that his work ended in February of 2008 for reasons unrelated to his medical

impairment raised questions about the extent to which Ferguson's continuing unemployment thereafter was truly the result of his medical problems.

With respect to Ferguson's daily activities, the ALJ did not reject Ferguson's subjective complaints solely based on his ability to do some chores. The ALJ acknowledged that Ferguson takes breaks while doing the dishes and uses a chair in the shower; however he also noted that Ferguson is able to drive to the store to get groceries and is able to meet his personal care needs. Therefore, the ALJ ultimately concluded that Ferguson's activities of daily living did not weigh heavily either in support of or against Ferguson's allegations.

After reviewing the ALJ's decision and the record, the court concludes that, because the ALJ gave several valid reasons for the ALJ's determination that Ferguson was not entirely credible, the ALJ's credibility determination is entitled to deference. The court finds substantial support in the record for the ALJ's conclusions. The ALJ thoroughly evaluated the record and gave specific reasons for finding Ferguson's complaints were not fully credible. See Gregg v. Barnhardt, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination.").

### D.    Hypothetical questions

Ferguson also argues that the ALJ failed to accurately and thoroughly present hypotheticals to the vocational expert and instead limited the vocational expert's consideration "to but a part of the whole." "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Jones v. Astrue, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (check this cite). "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Martise

v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (citing Lacroix, 465 F.3d at 889).

The ALJ's hypothetical question included all the limitations found to exists by the ALJ and set forth in the ALJ's RFC determination. Id. Based on the court's previous conclusion that the ALJ's RFC determination was supported by substantial evidence, the court finds that the hypothetical questions posed by the ALJ were proper, and the vocational expert's answers constituted substantial evidence supporting the Commissioner's denial of benefits. Id., see also Lacroix, 465 F.3d at 889.

## IV.    CONCLUSION

In this case, there is enough evidence supporting the Commissioner's decision to meet the "substantial" threshold and the decision to deny benefits falls within the zone of choice that prohibits this court from reversing the decision even though there is substantial evidence supporting a contrary outcome. Accordingly, Ferguson's Motion for Summary Judgment (Docket No. 10) is **DENIED**, the Commissioner's Motion for Summary Judgment (Docket No. 13) is **GRANTED**, and the above-entitled action is **DISMISSED**.

**IT IS SO ORDERED.**

Dated this 27th day of July, 2016.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court